# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN GEISEL**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:07cv1548 |
| | ) | Electronic Filing |
| **THE PRIMARY HEALTH NETWORK** | ) | |
| and **THE PRIMARY HEALTH** | ) | |
| **CHARITABLE FOUNDATION,** | ) | |
| | ) | |
| Defendants. | ) | |

## <u>OPINION</u>

John Geisel ("Plaintiff") commenced this employment discrimination suit against his
former employers, The Primary Health Network ("Network") and The Primary Health Charitable
Foundation ("Foundation"), seeking redress for failure to promote based on age and for
perpetuating a hostile work environment based on age and retaliation which resulted in plaintiff's
constructive discharge. Plaintiff's complaint sets forth causes of action for disparate treatment
based on age, retaliation for engaging in protected activity and hostile work environment which
culminated in plaintiff's constructive discharge in violation of the Age Discrimination in
Employment Act ("ADEA") and Title VII.[1] Presently before the court are defendants' motions
for summary judgment. For the reasons set forth below, Foundation's motion will be granted in
part and denied in part and Network's motion will be denied.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted
if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and

---

[1] Plaintiff also sets forth corresponding claims under the Pennsylvania Human Relations Act
("PHRA").

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim.  <u>National State Bank v. National Reserve Bank</u>, 979 F.2d 1579, 1582 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a <u>genuine issue for trial</u>," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  <u>Matsushita Electric Industrial Corp. v. Zenith Radio Corp</u>., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in <u>Matsushita</u>).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita</u>, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations."  <u>Williams v. Borough of West Chester</u>, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs."  <u>Harter v. GAF Corp.</u>, 967 F.2d 846 (3d Cir. 1992).  Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.  <u>Robertson v. Allied Signal,</u>

Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted. Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 113 S. Ct. 1262 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the background set forth below. Plaintiff was hired by Network in 1993 to perform part-time maintenance. Plaintiff was promoted to Director of Facilities in 1996. Plaintiff's daily duties were comprised of performing routine maintenance on Network's buildings. Plaintiff would either receive tasks directly or perform them based on his own initiative. Plaintiff was also responsible for assigning work to other maintenance employees.

In addition to his daily duties, plaintiff developed bid specifications, obtained estimates for new work projects, selected and coordinated bids, and oversaw the construction of new buildings and improvements on existing buildings. Plaintiff did not have computer or lease negotiation experience.

In early 2006, Network decided to restructure and create a new Facilities Administrator position. Plaintiff had a conversation with Network's dentist, wherein the dentist indicated that he had heard that plaintiff was being replaced by Mark Marriott ("Marriott"). Plaintiff was unaware of Network's decision to restructure and asked to meet with Network CEO Jack Laeng ("Laeng") out of concern about his position. Laeng told plaintiff he was satisfied with plaintiff's performance. The opening for the new position was not mentioned by Laeng and plaintiff was

not thereafter encouraged to apply. During the meeting, Laeng asked when plaintiff planned to retire.

On April 1, 2006, Marriott was hired as Facilities Administrator. Marriott had been recommended to Laeng by friends.[2] The opening was never posted or advertised. The responsibilities of Facilities Administrator ultimately were refined to require "the person holding that position to administer service and construction contracts, solicit bids for construction projects, develop or arrange leases for the Network, assist with preparation of budgeting and tracking expense against budgets, as well as have computer literacy in Microsoft Word and Excel." Foundation's Concise Statement of Material Facts (Doc. No. 81) at ¶ 5.

A memorandum announcing Marriott's hire stated that Marriott's duties would be "[the] identification of new sites and or buildings for use by the Network and the management of leases, bids and housekeeping services." Deposition of Laeng (Doc. No. 63-6). As Facilities Administrator, Marriott identified his basic duties as retrieving and categorizing work orders, giving his employees daily assignments, and disbursing the employees to perform their assignments.

After high school Marriott worked in the carpentry and construction fields. According to Marriott's resume he was experienced in contract negotiation, project estimation, building regulations, material purchasing, recognizing design problems, budget analysis and construction planning and scheduling. Marriott had little or no familiarity with Microsoft Word or Excel at the time he was hired. Marriott completed Microsoft Word I training on October 19, 2006, Excel I training on October 26, 2006 and Excel II training on November 9, 2006.

---

[2] Additionally, Laeng and Marriott were members of the same church and their children attended the same school.

Following Marriott's hire plaintiff experienced several changes to his daily routine. First, a certain amount of discretion in performing daily tasks was lost. Second, Network employees' requesting maintenance work were no longer able to contact plaintiff directly. Finally, his duty of setting the work schedule for the maintenance department was subsumed by Marriott.

Marriott made it clear to plaintiff that plaintiff was no longer in charge and was now under Marriott's direct order. Marriott took over the discretionary and supervisory duties that plaintiff had maintained under past supervisors. For example, plaintiff recalled an instance where plaintiff and another co-worker were changing outdoor light bulbs on a nice day. Marriott admonished plaintiff for taking this initiative - stating that plaintiff was to do nothing without the directive of Marriott. Additionally, Marriott took over a number of plaintiff's duties, including "retrieving and categorizing work orders, assigning work to his employees, and disbursing them to perform the work." Deposition of Marriott (Doc. No. 75-2) at page 8.

On September 25, 2006, plaintiff filed an EEOC claim against Network alleging unlawful discrimination on the basis of age in conjunction with the hiring of a new Facilities Administrator. Directly thereafter, plaintiff was no longer permitted to go upstairs in the administrative building. No explanation was provided for this prohibition.

Plaintiff filed a second claim against Network on June 6, 2007 for hostile work environment. Network hired a private detective to investigate plaintiff and interview plaintiff's co-workers, including Drew Welch ("Welch"). Shortly before a scheduled interview, Welch indicated to plaintiff that he felt uncomfortable meeting with the detective, stating "if I tell the truth, I jeopardize my job. If I lie, I screw you." Deposition of Geisel (Doc. No. 63-2) at 142.[3]

---

[3] Although this statement appears to be hearsay as presented, a plaintiff is not required to reduce all information to admissible evidence at summary judgment. Information in the form of inadmissible evidence may be considered where it is likely that the information can be reduced

The detective also interviewed Marriott and other co-workers of plaintiff, such as Mary Lynne Reed.

Plaintiff raises several other incidents in support of his hostile work environment claim. In 2005, plaintiff's immediate supervisor, Bill Friedrich ("Friedrich"), asked plaintiff to quit and in the process told plaintiff that Laeng had ordered Friedrich to fire plaintiff if he did not quit. Marriott taunted plaintiff on several occasions. For example, on a cold day when plaintiff was shoveling snow, Marriott called plaintiff and commented about the irony of Marriott being a 38 year old man in his warm office watching a 60 year old man shovel snow. Similar taunting occurred on hot summer days while plaintiff was cutting grass. Marriott later told plaintiff that he was sorry for treating plaintiff in this manner, explaining that Marriott had been directed either to find a reason to fire plaintiff or provoke him to quit.

Plaintiff worked for Network until January 31, 2008 when responsibility for facilities management and maintenance services for Network was transferred to co-defendant Foundation. Employees were required to reapply with Foundation as part of this process. Mark Tallarico ("Tallarico") was in charge of the hiring process. Plaintiff applied for the position of Facilities Administrator. Marriott was hired for the position. Plaintiff was hired by Foundation on February 1, 2008, as Director of Facilities. Plaintiff's pay and job responsibilities remained the same.

Plaintiff had a satisfactory work record during his course of employment. Laeng testified that plaintiff's performance throughout his employment was adequate. Plaintiff received salary increases following yearly evaluations. Plaintiff was written up once by Marriott for not

---

to admissible evidence at trial. See J.F. Fesser, Inc., v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990).

performing a task within a given time period.  However, the job had to be performed under poor

working conditions and plaintiff had made every reasonable effort to complete the job on time.

On October 14, 2008, Welch and plaintiff were working at a job site when they got into a

verbal confrontation.  Welch left the job site.  Marriott instructed plaintiff to clean up the job site,

find Welch, and return to his office to meet with Marriott and Tallarico.  When Welch and

plaintiff arrived at the office, Welch left work and stated that he would meet with Marriott and

Tallarico the next day.  Welch was not disciplined for failing to attend the meeting as directed.

Following this incident, plaintiff asked for and was given three days vacation time, with the

expectation that he return to work the following Monday.  Plaintiff viewed the incident as the

"last straw" and submitted a letter of resignation on October 17, 2008.  Plaintiff was told that his

job was still open and Foundation wanted him to return.

**I. Plaintiff's Failure to Hire\Promote Claim Under the ADEA**

It is well-settled that claims of discrimination based on circumstantial evidence are to be

evaluated at summary judgment using the shifting burdens of proof initially established by the

Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  St. Mary Honor

Center v. Hicks, 509 U.S. 502, 506 (1993); Waldron v. SL Industries, Inc., 56 F.3d 491, 495 (3d

Cir. 1995) (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).  Under this framework

the parties' respective evidentiary burdens have been summarized as follows:

> First, the plaintiff has the burden of proving by
> the preponderance of the evidence a prima facie case of
> discrimination. Second, if the plaintiff succeeds in proving
> the prima facie case, the burden shifts to the defendant to
> articulate some legitimate, nondiscriminatory reason
> for the [adverse employment action]. Third, should the
> defendant carry this burden, the plaintiff must then have
> an opportunity to prove by a preponderance of the evidence
> that the legitimate reasons offered by the defendant were
> not its true reasons, but were a pretext for discrimination.

Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-253 (1981) (citation omitted).

Under the indirect evidence approach a plaintiff must present a prima facie case of discrimination. Keller v. Orix Credit Alliance, Inc.,130 F.3d 1101, 1108 (3d Cir. 1997). The major purpose of the prima facie case is to eliminate the most obvious lawful explanations for the defendant's adverse employment action and raise a presumptive inference of discrimination. Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352 (3d Cir. 1999) (citing Burdine, 450 U.S. at 253-54 ("[t]he prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection.")). A prima facie case raises an inference of discrimination because the presumed circumstances, if left unexplained, indicate it is likely that the defendant's actions were based on consideration of impermissible factors. Id. (quoting Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978)).

There is no talismanic formula for presenting a prima facie case. Jones v. School District of Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999) ("the elements of a prima facie case depend on the facts of the particular case"). The relevant inquiry is whether the plaintiff has suffered an adverse employment action under circumstances which raise an inference of unlawful discrimination. Waldron, 56 F.3d at 494. Plaintiff's burden at this step is "minimal" and is viewed as a means of presenting a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. Id.; see also Furnco, 438 U.S. at 577.

If the plaintiff presents a prima facie case, the second stage of the McDonnell Douglas paradigm requires the defendant to articulate a legitimate explanation for the adverse employment action. Keller, 130 F.3d at 1108. The defendant's burden at this step is one of

production, not persuasion, and the court's consideration of it "can involve no credibility assessment." St. Mary's Honor Center, 509 U.S. at 509.  If the defendant meets this burden, the presumption of discrimination created by the prima facie case "drops" from the case.  St. Mary's Honor Center, 509 U.S. at 511; Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).

Once the defendant has met its burden of production and provided a legitimate explanation for its adverse employment action, the court's analysis turns to the third and final step of the inquiry, which is usually the most critical  in resolving a motion for summary judgment.  Jones, 198 F.3d at 410.  At this juncture the plaintiff must be afforded the "opportunity to [present evidence that is sufficient to] prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Burdine, 450 U.S. at 253.  At trial, the plaintiff must have evidence that could convince the finder of fact "both that the [defendant's] reason was false, and that discrimination was the real reason."  St. Mary's Honor Center, 509 U.S. at 515.  This is because while the burden of production under the McDonnell Douglas analysis shifts, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Jones, 198 F.3d at 410 (quoting Burdine, 450 U.S. at 252-53 (1981)).[4]

---

[4] Defendants argue that the requirement of "but for" causation as emphasized by the Supreme Court in Gross v. FBL Financial Services, Inc., 129 S. Ct. 2343 (2009), applies to defendants' decision not to hire plaintiff as Facilities Administrator.  The Court's analysis in Gross involved a mixed motives analysis under Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).  Gross, 129 S. Ct. 2343.  It explained that unlike a mixed motives case under Title VII where the burden of persuasion shifts to the plaintiff after he or she sufficiently has demonstrated that both permissible and impermissible motives were at play in the decision or action at hand, the ADEA has never been amended to endorse such an approach.  Id. at 2349.  Accordingly, the traditional approach in employment cases mandated that the plaintiff retain the burden of proving causation

In general, a plaintiff may establish a prime facie case by demonstrating that (1) he is a member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) the circumstances raise an inference of discrimination, such as where similarly situated individuals outside the protected class were treated more favorably. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002); see also Sheridan v. E. I. DuPont de Nemours & Co., 100 F.3d 1061, 1066 n. 5 (3d Cir. 1996) (en banc), cert. denied, 521 U.S. 1129 (1997) (discussing nature and purpose of prima facie case). The central focus of the inquiry is always whether the employee is being treated less favorably because of a protected trait. Pivirotto, 191 F.3d at 352 (quoting International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15 (1977)). In short, the plaintiff must be able to point to "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." Id. at 355. (quoting O'Connor v. Consolidated Coin Caterer's Corp., 517 U.S. 308, 312 (1996)).

Plaintiff was born in 1947. He was 59 when Marriott was hired as Facilities Administrator and 61 when he resigned from employment with the Foundation. Plaintiff was

---

and persuading the finder of fact that the illegal criterion was a substantial factor that had a direct impact in the adverse employment action. Id. at 2351. To the extent defendants are implying that the Court's use of the phrase "but for" causation should be understood as requiring a showing of sole causation, their contention is misplaced. See Smith v. City of Allentown, 589 F.3d 684, 690 (3d Cir. 2009) (reiterating that the burden of persuasion remains with the plaintiff at all times under the McDonnell Douglas burden shifting analysis, including the burden of proving "but for" causation) (citing Starceski v. Westinghouse Elec. Corp., 54 F.3d 1088, 1096 n.5 (3d Cir. 1995) ("In Miller[v. CIGNA Corp., 47 F.3d 586, 593-94 (3d Cir. 1995)], we rejected the statement in Griffiths [v.CIGNA Corp., 988 F.2d 457 (3d Cir. 1993)] that an employee advancing a McDonnell Dogulas/Burdine pretext theory must show that invidious discrimination is the 'sole cause' of his employer's adverse action.")). Here, even in the absence of Gross the mixed motives framework would be inapplicable because there is insufficient evidence to warrant a shifting of the burden of persuasion. Instead, the legal framework applicable to the indirect evidence approach is set forth in McDonnell Douglas.

one of defendants' older employees.  Thus, plaintiff  is a member of a protected class and meets the first prong of the analysis.

Defendants vehemently argue that plaintiff was not qualified for the position of Facilities Administrator.[5]  Plaintiff maintains that Marriott was not qualified for the position and plaintiff was at least as qualified as Marriott at the time of hire.  Therefore, plaintiff  contends that he can satisfy the second element of a prima facie case.

Where an employer hires an employee who does not meet the objective job qualifications for a given position, the employer cannot rely on those objective job qualifications to defeat a plaintiff's prima facie case; instead, the qualifications possessed by the individual who was hired become the applicable objective standards. See Scheidemantle v. Slippery Rock University, 470 F.3d 535, 541 (3d Cir. 2006) (holding that "by departing from a job posting's objective criteria in making an employment decision, an employer establishes different qualifications against which an employee or applicant should be measured for the position" and reasoning that failing to recognize this principle would reduce discrimination law to a "bark with no bite").  Thus the relevant inquiry is whether the plaintiff was as qualified as the person who ultimately obtained the position.  Pinckney v. County of Northampton, 512 F. Supp. 989, 998 (E.D. Pa.1981), aff'd, 681 F.2d 808 (3d Cir.1982).

Defendants' principle argument that plaintiff  cannot show he was qualified for the Facilities Administrator position is unavailing.  Defendants rely on a document outlining the

---

[5] While each defendant takes this position, plaintiff has conceded that he did not meet the job qualifications for Facilities Administrator in January of 2008 when a portion of Network's employees and responsibilities were transferred to Foundation.  Consequently, he does not oppose Foundation's motion to the extent it seeks summary judgment as to the failure to promote claim against it at Counts III and V and as a result the disparate treatment claim for failure to promote is now limited to his employer at the time the Facilities Administrator position was first created: Network.

qualifications for the Facilities Administrator and assert that plaintiff was inexperienced with

negotiating leases, developing shop drawings, and certain computer programs, namely Microsoft

Word and Excel.  The record, however, demonstrates that there are genuine issues of material

fact as to what the objective qualifications were at the time Marriott was hired.  And when read

in plaintiff's favor it will support a finding that plaintiff was qualified for the position.

First, defendants cannot erect the "alleged" job qualifications as a bar to plaintiff

establishing a prima facie case.  The "alleged" qualifications are set forth in a document entitled

"Facilities Administrator," which describes the position as "requir[ing] the person holding that

position to administer service and construction contracts, solicit bids for construction projects,

develop or arrange leases for the Network, assist with preparation of budgeting and tracking

expenditures against budgets, as well as have computer literacy with Microsoft Word and

Excel."  Deposition of Mark Marriott (Doc. No. 63-4) at 8.  Notably, however, this document is

not dated and is insufficient to support a conclusive determination that these qualifications were

established at the time Marriot initially was hired.  Id. at Ex. 1.  Additionally, Laeng testified that

he could not recall whether he showed the job description to Marriott during the interview

process.  The only dated evidence proffered by Network to establish the qualifications for

Facilities Administrator in April 2006 is a memorandum sent on March 30, 2006.  That

memorandum states that Marriott's primary duties "involve the identification of new sites and or

buildings for use by the Network and the management of leases, bids and housekeeping

services."  Deposition of Laeng (Doc. No. 63-6) at page 20.

Assuming for the sake of argument that the aforementioned job description set forth the

requirements for the position, it has not been conclusively demonstrated that Marriott met the

qualifications at the time of hire.  Shortly after hire Marriott completed Word I and Excel I

classes, which presumably exposed him to the basics of these programs.  The inference must be drawn that Marriott lacked experience with Microsoft Word and Excel.  Furthermore, Marriott's resume did not mention experience with lease negotiation.

Finally, there are substantial similarities between Marriott's daily duties and plaintiff's before Marriott's hire.  Marriott described his daily duties as follows:  "I retrieve all of the work orders that has come in either from the morning previous and I categorize them into importance. I assign assignments of who is to do what and where and what needs to be done, emergency situations.  I disburse the guys, who is to do what.  Every day is something new.  My day is filled every day."  Deposition of Marriott (Doc. No. 75-2) at page 8.   All of the duties described by Marriott were performed by plaintiff prior to Marriott's hire.  In light of the preceding, a genuine issue of material fact exists as to whether plaintiff was as qualified as Marriott, and at this juncture the inference that he was must be drawn in plaintiff's favor.

As to the third prong,  plaintiff has proffered sufficient evidence to support a finding that he suffered an adverse employment action when he was not considered for the position of Facilities Administrator.  The ADEA provides that "[i]t shall be unlawful for an employer to fail or refuse to hire any individual…because of such individual's age."  29 U.S.C. § 623(a)(1).  In addition, unlawful employment practices under the ADEA include  "discriminat[ing] against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  Thus, discriminatory conduct other than discharge or refusal to hire is prohibited if it alters an employee's "compensation, terms, conditions or privileges of employment," deprives the employee of "employment opportunities" or "adversely affects [the employee's] status as an employee." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997).

The principle that discriminatory conduct must alter an employee's compensation, terms, conditions, or privileges of employment has been implemented through the doctrinal requirement that the alleged conduct constitute an "adverse employment action." Id. In this jurisdiction "the 'adverse employment action' element of a . . . plaintiff's prima facie case incorporates the [ ] requirement that the [actionable] conduct rise to the level of [29 U.S.C. § 623 (a) (1)]." Id. Under this standard "unsubstantiated oral reprimands" "unnecessary derogatory comments" and other minor negative treatment by the employer does not rise to the level of a materially adverse employment action. Id. at 1301.

Plaintiff's evidence, when all reasonable inferences are drawn in his favor, will support a finding that he has met the requirement of proving that adverse employment action was taken. The central thrust of his disparate treatment claim is that he was denied the opportunity to apply for and receive a position that would have permitted him to continue in his role as Facilities Director as it had been carried out. Thereafter, his duties were transferred to Marriot and he effectively was placed in a position that can be found to be a demotion. In this area the courts have consistently recognized that changes in location, duties, perks, or other basic aspects of the job may rise to level of a materially adverse employment action, thus precluding summary judgment. See Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 788 (3d Cir. 1998); Jones v. School District of Philadelphia, 198 F.3d 403, 411-12 (3d Cir. 1999) ("We have held that employment decisions such as transfers and demotions may suffice to establish the third element of a plaintiff's prima facie case.") (citing Torree v. Casio, Inc., 42 F.3d 825, 830 (3d Cir. 1994) (a job transfer, even without loss of pay or benefits, may, in some circumstances, constitute an adverse job action)).

Finally, it is of significance that when plaintiff met with Laeng, he was asked when he planned to retire and was not invited to submit an application. The encounter between plaintiff and Laeng could lead a reasonable jury to infer that plaintiff was not encouraged to apply and was not being considered for the position because of his age. Furthermore, the job was given to someone substantially younger and outside the protected class.[6]

Turning to the second step of the <u>McDonnell Douglas</u> analysis, defendant proffers two reasons for not considering plaintiff for the position: (1) his lack of qualifications and (2) his failure to apply. These reasons sufficiently shift the burden to plaintiff to establish that the record will support a finding of discrimination by pretext or otherwise.

The fact that plaintiff never applied for the position of Facilities Administrator is not dispositive. <u>See</u> <u>Fowle v. C & C Cola</u>, 868 F.2d 59, 68 (3d Cir. 1989) ("In order to establish that he 'applied' for a position, a plaintiff need not necessarily file a formal application.") (citing <u>Carmichael v. Birmingham Shaw Works</u>, 738 F.2d 1126, 1133 (11th Cir. 1984)). The application requirement will be deemed to be satisfied when an employer had some reason or a duty to consider an employee for the position. <u>See</u> <u>Fowle</u>, 868 F.2d at 68. Furthermore, an employer who does not provide formal notice of an opening (and thus invite applications), "has a duty to consider all those who might reasonably be interested, as well as those who have learned of the job opening and expressed an interest." <u>Carmichael</u>, 738 F.2d at 1133.

Network relied on "word of mouth" to hire Marriott. The position was not posted and the requirements were not firmly established. There were many similarities between the daily responsibilities initially assigned to the position and those that were being performed by plaintiff.

---

[6] Marriott was born in 1967, and is twenty years younger than plaintiff.

Plaintiff met with Leang out of concern about his job performance and potentially being replaced. Although this meeting occurred after Network formulated its plan to reorganize and hire a new Facilities Administrator, plaintiff was not even informed of the opening. A fact finder could conclude, based on plaintiff's years of experience as Facilities Director, that he would be interested in the position of Facilities Administrator. It follows that the finder of fact also may well conclude that defendant recognized plaintiff would be interested in the position and thus had a duty to communicate that opening to plaintiff.

Plaintiff proffers additional evidence to prove that the legitimate reasons offered by the defendant were a pretext for discrimination. Burdine, 450 U.S. at 253. Defendant does not raise any deficiencies in plaintiff's past performances as a basis for not considering plaintiff. In fact, Laeng informed plaintiff during their March 2006 meeting that he was satisfied with plaintiff's performance. Also, plaintiff points to several occasions where supervisors allegedly revealed to him that it was their objective to get plaintiff to quit or do something that would be grounds for termination. These repeated statements when coupled with the facts from the prima facie case and the absence of a legitimate reason for not considering plaintiff raise an inference that age was being considered in filling the Facilities Administrator position.

In short, the record will support findings that plaintiff was sufficiently qualified for the position and Network did not give plaintiff an opportunity to apply when it had a duty to do so. Plaintiff's evidence offered to discredit the defendants' legitimate reasons coupled with the inferences a reasonable jury could draw from plaintiff's prima facie case could lead a finder of fact to conclude that plaintiff's age "actually played a role in [the employer's decision making] process and had a determinative influence on the outcome." Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993).

**II. Plaintiff's Hostile Work Environment and Constructive Discharge Claims**

Plaintiff advances his hostile work environment claims based on age and retaliation against both defendants and constructive discharge claims based on both theories against Foundation. Defendants contend that plaintiff's evidence is insufficient to establish liability. Foundation further contends that it cannot be held liable for the acts of its predecessor because it had no control over the environment that existed at that time. Defendants' positions are wide of the mark.

The ADEA prohibits discrimination "against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The procedures and interpretations applicable to Title VII generally apply to cases governed by the ADEA. See Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (Title VII interpretations apply with equal force to age discrimination claims). The prohibition "not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of [protected employees] in employment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (quoting Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)). A work environment becomes a violation 'when the workplace is permeated with discriminatory [age-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir. 2003) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). See also Meritor, 477 U.S. at 66 (employees are entitled to protection from "working environments [that are] so heavily polluted with discrimination as to destroy

completely the emotional and psychological stability of minority group workers") (quoting Rodgers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)).

A prima facie case of a hostile work environment has the following elements: (1) the employee suffered intentional discrimination because of a protected trait; (2) the discrimination was pervasive or regular;[7] (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same [age] in that position; and (5) the existence of respondeat superior liability. Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 276-77 (3d Cir. 2001). Proffering sufficient evidence to meet each element of a hostile work environment claim generally precludes summary judgment in the defendant's favor and permits the plaintiff to proceed to trial. Id. at 280-281.

In analyzing whether a plaintiff has established a prima facie case, the court cannot confine its analysis to "the individual pieces of evidence alone," but must "view the record as a whole picture." Id. at 276 (citing Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997)). This is because "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but the overall scenario." Id. (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990)).

Because plaintiff's claim is a compound hostile work environment /constructive discharge claim, he is required to present more than a prima facie case of hostile environment: he must present evidence from which the finder of fact can conclude that the "working

---

[7] The United States Court of Appeals for the Third Circuit has observed that in light of Supreme Court decisions, the second element properly is phrased as requiring the harassment to be pervasive or regular, as opposed to pervasive and regular. See Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006), overruled in part on other grounds by Burlington N. Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).

conditions were so intolerable that a reasonable person would have felt compelled to resign."

Pennsylvania State Police v. Sunders, 542 U.S. 129, 131 (2004). "'Under the constructive

discharge doctrine, an employee's reasonable decision to resign because of unendurable working

conditions is assimilated to a formal discharge for remedial purposes.'" Hill v. Borough of

Kutztown, 455 F.3d 225, 233 n.7 (quoting Pennsylvania State Police, 542 U.S. at 141. "The

inquiry is objective: Did working conditions become so intolerable that a reasonable person in

the employee's position would have felt compelled to resign?" Id.

Plaintiff proffers the following evidence in support of his claim for hostile work

environment: (1) plaintiff was asked by a supervisor in 2005 if he was going to retire, and told

that he would be fired if he did not quit; (2) plaintiff was asked by a company dentist if he was

being replaced; (3) plaintiff met with CEO Laeng in 2006 to inquire if he was being replaced

because of  unsatisfactory performance and Laeng informed plaintiff that he was happy with

plaintiff's performance and then asked when he was planning on retiring; (4) during the meeting

Laeng did not mention the creation of the Facilities Administrator position; (5) after Marriott's

hire, plaintiff's discretionary and supervisory duties were removed; (6) immediately after filing a

complaint with the EEOC plaintiff was denied access to a second floor administration building

without explanation; (7) Marriott taunted plaintiff while he was performing unpleasant tasks and

alluded to the irony of their age while doing so;  (8) Marriott apologized to plaintiff, telling him

he had been given the directive to either get plaintiff to quit or do something to get himself fired;

(9) Network hired a private investigator to investigate plaintiff and interview his co-workers;

(10) plaintiff's argument with another co-worker resulted in both being told to report to

management and when the much younger co-worker directly defied that directive he was not

reprimanded or punished in any way.

A trier of fact could find that plaintiff suffered intentional discrimination because of age. His supervisors repeatedly inquired about when plaintiff was going to quit or retire. He was subjected to taunting by Marriott followed by demeaning remarks about age and job responsibilities. His discretionary and supervisory duties were removed and vested in a younger hire, who emphasized the plaintiff's age in a demeaning manner. Plaintiff was made to understand that he could not perform even the simplest maintenance tasks unless he had been told to do so by his younger supervisor. After plaintiff made a formal complaint about age discrimination his freedom of access on the job site was abruptly restricted without further explanation. An investigator was hired and began to interview plaintiff's co-workers. Plaintiff was advised by his immediate supervisor that a directive had been handed down to harass plaintiff to get him to quit or do something that would result in termination. And plaintiff was required to report and account for a workplace confrontation while the much younger co-worker involved was permitted to disobey the directive with impunity.

While admittedly the later portion of this evidence also pertains to the retaliation component of plaintiff's hostile work environment claim, it remains rooted in and connected to plaintiff's claim of ongoing hostility because of his age. And it reasonably can be viewed as a continuation of the course of hostile treatment attributable to plaintiff's age. In light of that logical relationship, it would be improper to compartmentalize the evidence between the two forms of illegal animus in a manner that diminishes its potential import as a whole. See West v. Philadelphia Electric Co., 45 F.3d 744, 756-57 (3d Cir. 1995) (holding that the "'totality' approach cannot support the 'same actor' or 'same form of discrimination' requirements imposed" by the district court and reasoning that " [a] hostile work environment is like a disease. It can have many symptoms, some of which change over time, but all of which stem from the same

root."); <u>King v. M.R. Brown, Inc.</u>, 911 F. Supp. 161, 166 ( E.D. Pa. 1995) ("Since a hostile work environment claim is a "single cause of action," . . . <u>West</u> dictates that a jury be permitted to evaluate instances of impermissible harassment in the aggregate in order to ascertain whether the incidents collectively created a hostile work environment."); <u>see</u> <u>also</u> <u>Velez v. QVC, Inc.</u>, 227 F. Supp.2d 384, 410-13 (E.D. Pa. 2002) (finding multiple incidents of hostility potentially motivated by different forms of harassment to be probative of employee's hostile environment claim where there was a sufficient nexus and observing that "[d]isaggregating claims undercuts the totality of the circumstances inquiry, because it 'robs the incidents of their cumulative effect, and of course, when the complaints are broken into their component parts, each claim is more easily dismissed.'") (quoting <u>Jackson v. Quanex Corp.</u>, 191 F.3d 647, 660 (6th Cir.1999)). When viewed as a whole, the evidence will support a finding that plaintiff suffered discrimination because of his age.

The record also will support a finding that the employer's conduct rose to the level of severe or pervasive. Factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S.17, 23 (1993). Of course, the analysis also focuses on the "totality of the circumstances," as no one factor is determinative. <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1482 (3d Cir. 1990).

Plaintiff's proffered evidence is adequate. A reasonable jury could find the repeated inquiries about quitting/retirement, degrading and humiliating taunting and comments about age, and the removal of discretionary and supervisory duties in a humiliating and demeaning manner reflect an ongoing course of conduct that was pervasive. Furthermore, the restriction of access

and the hiring of a private investigator to investigate plaintiff and interview his co-workers after

complaining of age discrimination can be viewed as part of an ongoing course of conduct

stemming from a motive to treat plaintiff differently because of age.  Viewed as a whole, the

finder of fact can conclude that plaintiff's workplace pervasively was permeated with age-based

discriminatory animus.

Furthermore,  a jury could find that these incidents would detrimentally affect a

reasonable person of plaintiff's age**.**  It is well-settled that "[t]he mere utterance of an epithet,

joke, or inappropriate taunt that may cause offense does not sufficiently affect the conditions of

employment to implicate Title VII liability."  Weston v. Pennsylvania Department of

Corrections, 251 F.3d 420, 428 (3d Cir. 2001); see also Robinson,  120 F.3d at 1300  (It follows

from the statute's prohibitions "that 'not everything that makes an employee unhappy' qualifies as

[a prohibited act], for otherwise, minor and even trivial employment actions that 'an irritable,

chip-on-the-shoulder employee did not like would form the basis for a discrimination suit.'")

(quoting Smart v. Ball State University, 89 F.3d 437, 431 (7th Cir. 1996)).  To the contrary, the

Supreme Court made clear in Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993), that in order for

conduct to fall within the purview of Title VII, the conduct in question must be severe and

pervasive enough to create an "objectively hostile or abusive work environment - an environment

that a reasonable person would find hostile."  Id. at 21-22.  The Court has reiterated that by

making it unlawful to discriminate against an individual with respect to the compensation, terms,

conditions, or privileges of employment because of race, color, religion, sex or national origin,

Congress did not limit the scope of Title VII's protection to "economic or tangible

discrimination," but instead intended "to strike at the entire spectrum of disparate treatment of

men and women in employment, which includes working in a discriminatorily hostile or abusive

environment."  Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986).  It has also emphasized that the "mere utterance of an ... epithet which engenders offensive feelings in an employee" does not in itself alter the conditions of the recipient's employment and create an abusive or hostile working environment.  Such conduct is beyond Title VII's purview.  Harris, 510 U.S. at 21.  But establishing the existence of a discriminatorily abusive work environment does not require an employee to establish that the conduct affected his or her psychological well-being or caused the employee to suffer injury.  Id. at 22.  Title VII's protection comes "into play before the harassing conduct leads to a nervous breakdown."  Id.  What is necessary is a showing that the abusive environment could reasonably be perceived and actually was perceived by the employee as hostile and capable of detracting from job performance, continued employment or career advancements, although such actual tangible effects need not be demonstrated to offend the ADEA's broad rule of workplace equality.  Id.

There is no talismanic formula for determining whether an environment is sufficiently hostile or abusive.  Id.  The determination must be made by "looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (quoting Harris, 510 U.S. at 23)).

The record contains sufficient evidence to support a determination by the factfinder that plaintiff was subjected to an objectively hostile or abusive environment.  Plaintiff's supervisors made repeated comments implying that plaintiff should quit or retire.  Plaintiff was not given a equal opportunity to apply for the position of Facilities Administrator when it was first created and remarks made by Laeng suggested that plaintiff's age was a factor in the decision not to

invite plaintiff to apply. Plaintiff was placed in a position of less prestige, stripped of all supervisory responsibility and told he had to have direct authorization before undertaking even menial and routine tasks. Marriot made demeaning comments and taunted plaintiff while he performed unpleasant task with remarks that focused on plaintiff's age. Plaintiff's freedom of access in the workplace was further curtailed when he made a formal complaint of age discrimination. An investigator was hired to investigate plaintiff and interview his co-workers. And plaintiff's considerably younger co-worker was not required to comply with the same directives that appeared to be a precursor to disciplinary action after the two got into a workplace altercation. Plaintiff filed charges of discrimination on two separate occasions prior to resigning. This series of events is more than sufficient to support findings that plaintiff's work environment would detrimentally affect a reasonable worker of plaintiff's age and plaintiff perceived the workplace as hostile and was detrimentally affected by it.

With respect to the fifth prong, the existence of respondeat superior liability, a jury could find that this prong has been met. The Supreme Court has made clear that although Title VII is a remedial statute, its primary objective is to avoid harm. <u>Faragher</u>, 524 U.S. at 806. Consequently, the law and regulations under Title VII have recognized the employer's affirmative obligation to prevent violations and afford protection to those who make reasonable efforts to discharge that duty. Similarly, employees have a coordinate duty to use all reasonable means made available by the employer to avoid or minimize any injury or damages flowing from Title VII violations. <u>Id.</u> In order to accommodate these principles, the Supreme Court adopted the following approach for the imposition of vicarious liability where a supervisor is involved:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability

24

or damages, subject to proof by a preponderance of the evidence.... The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any [age-based] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. . . . No defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion or undesirable re-assignment.

Id. at 807-8. These tenants give sufficient recognition to liability that commonly is recognized where the supervisor is aided in the misconduct by virtue of his or her authority over the employee, while giving credit to employers who recognize their affirmative obligation to prevent violations and make reasonable efforts to discharge that duty.

In a companion case to Faragher, the Supreme Court defined a tangible employment action as one that "constitutes a significant change in employment status, such a hiring, firing, failing to promote, reassignment with significant different responsibilities, or a decision causing a significant change in benefits." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998). It likewise may be established by demonstrating a materially adverse change based upon other indices that are unique to the particular situation. Id. (citing with approval Crady v. Liberty National Bank & Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir. 1993)). In contrast, a demotion without change in pay, benefits, duties or prestige or even a re-assignment to a less convenient job or location is insufficient. Id. (citing with approval Kocsis v. Multi-Care Management Inc., 97 F.3d 876, 887 (6th Cir. 1996) & Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994)).

Plaintiff has proffered evidence that can support a finding of a hostile or abusive working environment fostered by various acts from his supervisors. All of the actions summarized above that constitute plaintiff's evidence in support of his hostile work environment reflect actions taken by plaintiff's supervisors or upper-level management. Plaintiff's evidence is capable of

supporting a finding that plaintiff was not promoted into a position of supervision that encompassed in large part the daily activities he had been performing for some time. Defendants have not established any form of a workplace anti-harassment policy. Consequently, the requirements for respondeat superior liability can be satisfied under either approach.

Finally, plaintiff has proffered sufficient evidence to advance the constructive discharge component of his hostile work environment claim. A hostile work environment claim premised on constructive discharge requires the plaintiff to proffer evidence that the conditions at the workplace were so intolerable that a reasonable person "in the employee's shoes" would resign. Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993) (citing Gray v. York Newspapers, Inc., 957 F.2d 1070, 1079 (3d Cir.1992) (quoting Goss v. Exxon Office Systems Co., 747 F.2d 885, 887-88 (3d Cir.1984)). While this inquiry is fact-intensive and must be done on a case-by-case basis, grounds that have been recognized as sufficient to support submitting such a claim to the jury include: (1) being threatened with discharge; (2) being urged or it being suggested that the employee retire; (3) demotion or reduce in pay or benefits; (4) involuntary transfer to a less desirable position; (5) and an altering of job responsibilities. Clowes, 991 F.2d at 1161. Furthermore, whether the employee made any complaints or requests for meaningful changes in supervision or the environment, and, if so, the employer's actions in response are also pertinent. Id.

First and foremost, the hiring of an investigator to investigate plaintiff and interview his co-workers, whether done as ongoing harassment or retaliation, or both, provides more than a sufficient basis for a finding that the workplace became so intolerable that a reasonable person would feel compelled to resign. It is difficult to conjure up employer conduct that is more alienating, ostracizing or humiliating. Such conduct clearly is aimed at ending the employment

relationship and outright invites the employee's resignation.  And while Foundation makes much of the fact that Network was the entity that did so, the actual conduct was done during the time plaintiff worked for Foundation and directly prior to his resignation.  Undertaking such measures could only adversely effect the existing employment relationship, which at that time was between plaintiff and Foundation.  Given this setting and the continuity of supervisory and high-level officers between the two entities, Foundation cannot place itself behind a Chinese wall and avoid potential responsibility for this conduct.

Furthermore, plaintiff has offered evidence to support four of the five grounds highlighted in <u>Clowes</u>.  Plaintiff has proffered  evidence that his supervisors repeatedly asked when he was going to quit or retire.  Plaintiff was passed over for promotion and effectively demoted.  Thereafter, he was stripped of any discretionary decision-making  and all supervisory duties were removed.  Plaintiff's job responsibilities were altered when he was required to report to Marriott before performing even menial daily tasks, and was no longer permitted to schedule and disburse co-workers to perform even routine maintenance work.   That plaintiff  did not explore other options before submitting his resignation, and was encouraged to return to work after submitting his resignation, merely provides counter evidence for the jury to consider.  Accordingly, plaintiff has proffered sufficient evidence to permit the jury to find a hostile environment existed that would lead a reasonable employee of his age to resign.

Foundation further asserts that it cannot be held liable for events that occurred prior to its formation.  It contends that the events that occurred after the transfer of a portion of Network's employees and responsibilities do not rise to the level of severity necessary to support a claim of hostile work environment resulting in constructive discharge.  Foundation's argument is unavailing for a number of reasons.

In <u>National Railroad Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002), the Court distinguished between discrete discriminatory acts and hostile environment claims. Hostile environment claims are based on the cumulative effect of individual acts or repeated conduct, any one of which may not be actionable on its own. <u>Id.</u> at 115. It is the cumulative effect of such acts over a period of time, perhaps even years, that elevates the series of acts to the level of an "unlawful employment practice." <u>Id.</u> at 115-17.

As this member of the court made clear in <u>Lake v. AK Steel</u>, the general premise of defendant's position that it cannot be held liable for acts of its predecessor's employees over which it could not exercise control does not automatically apply to hostile work environment claims where the new employer had reason to know of the hostile working conditions. 2006 WL 1158610 at 23 (W.D.Pa. 2006) ("[W]here a new employer discovers or should have discovered an existing hostile environment at a recently acquired facility and thereafter fails to take prompt and effective remedial measures calculated to eliminate it, the employer in effect permits the cumulative effect of the separate acts occurring before its ownership to continue."). By not taking action, the new employer becomes "responsible for the culmination of acts forming a single ongoing unlawful employment practice." <u>Id.</u>

For Foundation to be held liable for acts occurring before the company's existence, the acts must (1) be part of a series of separate acts that collectively constitute a single unlawful employment practice in the form of an actionable hostile work environment and (2) Foundation must have become aware of the hostile environment and permitted it to continue during its ownership. <u>Id.</u> These are issues to be determined by the fact finder provided plaintiff has proffered sufficient evidence to support such findings. <u>Id.</u>

In concluding that Foundation's potential liability is factually dependent upon its responsibility for ongoing (and thus related) acts occurring under its watch, we have not overlooked the general principles underlying the doctrine of successor liability under Title VII, and concomitantly the ADEA. That doctrine is derived from equitable principles and permits an aggrieved employee to enforce against a successor employer a claim or judgment he or she could have enforced against the predecessor. Rego v.ARC Water Treatement Company of Pa., 181 F.3d 396, 401 (3d Cir. 1999). The policy is designed to protect employees when ownership of the employer suddenly changes. Pertinent considerations include "(1) continuity in operations of the workforce of the successor and predecessor employers; (2) notice to the successor employer of its predecessor's legal obligation; and (3) ability of the predecessor to provide adequate relief directly." Id. at 402 (quoting Criswell v. Delta Airlines, Inc., 868 F.2d 1093, 1094 (9th Cir. 1989)).

Plaintiff presents sufficient evidence to support a finding that there was continuity in the operations and managerial workforce of Network and Foundation. First, the hierarchical reporting structure of the two entities virtually were identical. Marriott remained plaintiff's immediate supervisor and Welch plaintiff's sole helper. The only change consisted of Tallarico essentially taking over the position held by Laeng. However, there is a sufficient connection between the two, as Tallaraco is Laeng's brother-in-law and both serve on the same board of directors. Laeng provided mentoring to Tallarico and oversight after he first took over. Given the minimal changes in work force, any argument that Foundation did not have notice of plaintiff's previous complaints to the EEOC or the environment that existed under the auspices of Network is unavailing. Accordingly, plaintiff has presented sufficient evidence to support a

finding that Foundation had notice of the environment that existed under Network as a result of the continuity of the supervisors and workforce.

Foundation also can be charged with knowledge of plaintiff's complaints of discrimination. Both of plaintiff's charges of discrimination against Network had been filed before Foundation was brought into existence. The charges essentially were leveled against the same managerial workforce that was transferred to Foundation. And the evidence as it relates to the events occurring on Network's watch will support plaintiff's hostile work environment claims against Network. Compare Brzozowski v. Correctional Physician Services, Inc., 360 F.3d 173, 178 (3d Cir. 2004) (Weis, J.) (where Rego factors can be satisfied and the plaintiff's claim is neither unduly strengthened or weakened against the successor, there is nothing improper about applying the doctrine of successor liability in the employment setting). It follows that Foundation can be found liable for the entire unlawful employment practice if there is sufficient evidence to permit a finding that Foundation permitted the environment to remain hostile after it assumed control over it.

Plaintiff has proffered sufficient evidence to support such findings. First, the evidence surrounding the hiring of an investigator implicates Foundation. Network is the entity that supposedly hired the investigator. But the investigation and interviewing of plaintiff's co-workers occurred in 2008 when plaintiff was employed by the Foundation. Given the overlap of management personnel between the two entities and the fact that Network had hired an investigator to probe an individual who worked for Foundation, the finder of fact could make findings as to both requirements on this evidence alone.

Moreover, plaintiff has advanced the evidence surrounding the incident with Welch. While Foundation seeks to minimize the import of this incident by isolating it from all other

evidence, such a myopic view is inappropriate. It is plaintiff's contention that Welch essentially was hired as an individual to replace plaintiff once he was no longer working for defendants, and plaintiff was required to train Welch. Welch verbally assaulted plaintiff on the job site and then left without explanation. Plaintiff was told to finish up, clean up the site, and find Welch. Both were to come and meet with Marriot and Tallarico. When Welch and plaintiff arrived at the office, Welch left and said he would meet with the supervisors the next day. Plaintiff explained to Marriot and Tallarico that Welch had verbally assaulted him. According to plaintiff, Marriot and Tallarico refused to take any action against Welch and began to counsel plaintiff about effective stress management. Plaintiff perceived this as another example of harassment aimed at him.

Although the jury may agree with Foundation that the Welch incident is much to do about nothing, it can also be viewed as yet another example of defendants' managerial staff displaying overt favoritism to younger workers and expecting plaintiff to comply with a different and more scrutinizing workplace protocol. To be sure, such conduct does not rise to the level of disparate treatment. But it need not do so for the purposes of proving a hostile work environment. And it follows that when viewed in the light most favorable to plaintiff and considered with the entire work environment that can be attributable to the managerial employees that continued with  Foundation, it can be rationally found to be a basis for finding the elements for successor liability and constructive discharge against Foundation.

### III. Plaintiff's Constructive Discharge Based on Protected Activity Claim

Plaintiff alleges that defendants created a hostile work environment in retaliation for claims he filed with the EEOC. Plaintiff presents the following evidence in support: (1) plaintiff was forbidden to enter the administrative offices immediately after filing a claim with the EEOC;

(2) on two occasions Marriott taunted plaintiff by making reference to the irony of watching an older man perform unpleasant tasks and demeaning comments focusing on plaintiff's age; (3) Marriott allegedly apologized later and told plaintiff that it was his directive to either get plaintiff to quit or do something to justify firing him; (4) Network hired a private investigator to investigate plaintiff and interview plaintiff's co-workers; (5) after a much younger co-worker disregarded a directive to report to management following a workplace argument, the co-worker was not reprimanded or punished.

A prima facie case of retaliation requires the plaintiff to proffer evidence demonstrating the following: "(1) [he] engaged in conduct protected by Title VII; (2) after or contemporaneous with engaging in that conduct, [his] employer took an adverse action against [him]; (3) the adverse action was 'materially adverse'; and (4) there was a causal connection between [his] participation in the protected activity and the adverse employment action." Hare v. Potter, 220 Fed. Appx. 120, 127 (3d Cir. 2007).[8] Plaintiff's retaliation claim is controlled by the three-step burden shifting McDonnell Douglas analysis, as outlined above. See Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006) ("If the employee establishes this prima facie case of retaliation, the familiar McDonnell Douglas approach applies.").

In Burlington, the Supreme Court clarified that the anti-retaliation provision is not limited to "workplace-related or employment-related retaliatory acts and harm." Furthermore, it is not to be construed as "forbidding the same conduct prohibited by the antidiscrimination provision." Id. Retaliatory actions can be found to be "materially adverse" if they would have the effect of "dissuad[ing] a reasonable worker from making or supporting a charge of discrimination."

---

[8] Title VII jurisprudence applies with equal force to claims made under the ADEA because "the substantive provisions of the ADEA 'were derived *in haec verba* from Title VII.' " Trans World Airlines, Inc., 469 U.S. at 121 (quoting Lorillard v. Pons, 434 U.S 575, 584 (1978)).

Burlington, 548 U.S. at 2415 (what is materially adverse "often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed").

Although it protections are broad, the anti-retaliatory provision does not protect an employee from all forms of retaliation. Requiring a plaintiff to show "material adversity" serves the important purpose of separating "significant from trivial harms." Id. at 2415. Such an approach is necessary because, as previously noted, the Court has repeatedly emphasized that Title VII "does not set forth 'a general civility code for the American workplace.'" Id. (quoting Oncale, 523 U.S. at 80; and citing Faragher, 524 U.S. at 788) (judicial standards for sexual harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing' ")). In other words, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id. (noting that "courts have held that personality conflicts at work that generate antipathy" and " 'snubbing' by supervisors and co-workers" are not actionable under § 704(a))); see also Jensen, 435 F.3d at 451 ("[Title VII] does not mandate a happy workplace.").

The above standards for judging harm are to be administered from an objective point of view. Id. The court is not to delve into the subjective feelings of the employee. Id.

In utilizing the objective standard close attention is to be paid to context. "Context matters." Id. It is important to recognize that "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." Id. (quoting Oncale, 523 U.S. at 81-82). A work schedule change "may make

little difference to many workers, but may matter enormously to a young mother with school age children."  Id.  (citing in support Washington, 420 F.3d at 662 (finding flex-time schedule critical to employee with disabled child)).  Similarly, "[a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight.  But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination."  Id. at 2416 (citing 2 EEOC 1998 Manual § 8, p. 8-14).

Prong four, the causation prong, linking the protected conduct to the adverse action, requires an assessment of whether a reasonable jury could find the employer's conduct to be motivated by a retaliatory animus.  Id. at 128.  In undertaking this analysis it is appropriate to consider (1) the "temporal proximity" between the protected activity and the alleged retaliatory conduct and (2) "the existence of a pattern of antagonism in the intervening period."  Jensen, 435 F.3d at 450.

A retaliation claim based on a hostile work environment can go forward if that plaintiff can show that "a reasonable employee would have found the alleged retaliatory actions 'materially adverse.' "  Moore, 461 F.3d at 341.  In considering the plaintiff's evidence, "the overall scenario" must be analyzed to ascertain the employer's motivation.  Hare, 220 Fed. Appx. at 132 (citing Jensen, 435 F.3d at 450).  The inquiry focuses on whether a reasonable jury could find that the employer's actions were motivated by a retaliatory animus, thus creating a hostile work environment.  Hare, 220 Fed. Appx. at 132.

Plaintiff has proffered sufficient evidence to support a prima facie case of retaliation. Following his first charge of discrimination Marriot made humiliating and demeaning comments to plaintiff and taunted him in a manner that highlighted the very type of animus forming the

basis for his charge. These comments, according to plaintiff, were made because as Marriott

later confided he had been directed to force plaintiff to quit or provoke him into doing something

to get fired. Immediately after his second EEOC claim plaintiff was stripped of further

workplace freedoms when he was prohibited from accessing the second floor of the

administration building. No explanation was offered for this sudden change. Plaintiff's most

significant piece of evidence is Network's hiring of a private investigator. This occurred after

plaintiff's second claim with the EEOC. Welch actually confided in plaintiff that he felt

compelled to speak negatively about plaintiff for fear of losing his job.

Any one of the above actions – repeatedly being humiliated and taunted in a demeaning

fashion by a direct supervisor; being restricted in exercising any freedoms in performing even the

most routine tasks or activities in the workplace; and being investigated by a private detective

and having one's co-workers interviewed during the course of this process -- could intimidate

and dissuade a reasonable person from complaining of workplace discrimination. Two of these

bases properly can be attributable to Network and the jury may be convinced that the hiring of an

investigator properly is attributable to both defendants. Thus, each defendant may be found to

have engaged in a materially adverse action in violation of the anti-retaliation provisions of the

ADEA.

There is also sufficient evidence to support a causal link between the protected conduct

and the materially adverse acts. Of course, the record must contain sufficient evidence from

which the finder of fact can causally link the materially adverse action to the alleged retaliatory

animus. Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003); Lauren W. ex rel. Jean

W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007). Where a challenge to the sufficiency of a

plaintiff's evidence has been made as to causation, two central factors generally are brought into

play: (1) the "temporal proximity" between the protected activity and the alleged retaliation and (2) the existence of any "pattern of antagonism in the intervening period." Jensen, 435 F.3d at 450 (quoting Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 288 (3d Cir. 2001) and Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997)). "Timing alone raises the requisite inference when it is 'unusually suggestive of retaliatory motive.'" Id. (quoting Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir.1997)). "But even if 'temporal proximity ... is missing, [it is appropriate to] look to the intervening period for other evidence of retaliatory animus." Id. This is because the motivation of any individual is a question of fact, the resolution of which cannot be reduced to an application of one particular formula or another. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000); Moore v. City of Philadelphia, 461 F.3d 331, 346 (3d Cir. 2006). Thus, where the issue of the legal sufficiency of the evidence on causation has been raised, it is important to consider all of the proffered evidence as a whole to determine whether it "may suffice to raise the inference." Jensen, 435 F.3d at 450 (quoting Farrell, 206 F.3d at 280 and citing in support Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 178 (3d Cir.1997) ("The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific.")).

The events that can be viewed as retaliatory followed in fairly close in proximity to plaintiff's filing of his charges. Furthermore, the record will support an ongoing history of antagonism between plaintiff and Marriott as well as other upper level managerial employees such as Laeng and Tallarico. It further will support a finding that upper management had given directives and taken actions to make the workplace humiliating and hostile both before and after the charge(s) were filed. In short, plaintiff's proffered evidence would allow a reasonable jury to conclude that plaintiff was treated adversely for having filed claims with the EEOC, and that

36

such treatment would deter a reasonable person from exercising their rights. <u>See</u> <u>Hare</u>, 220 Fed. Appx. at 133.

## IV. Admissibility of Evidence

Finally, Foundation's wholesale attack on plaintiff's evidence as inadmissible hearsay and remote as it relates to Foundation is both premature and misunderstands the purposes for which Marriott's and other managerial employee's statements can be admitted.   Plaintiff's supervisors were decisionmakers and agents of Network and remarks by them reflecting inherent age bias are neither hearsay nor stray remarks.  <u>See</u> <u>Abrams v. Ligholeir, Inc.</u>, 50 F.3d 1204, 1214-15 (3d Cir.1995) (age related comments by supervisor were probative of supervisor's attitude toward older workers and thus admissible over evidentiary challenge as inadmissible hearsay and unrelated to decision under review); <u>Walden v. George-Pacific Corp.</u>, 126 F.3d 506, 521 (3d Cir.1997) ("Our cases distinguish between discriminatory comments made by individuals within and those by individuals outside the chain of decisionmakers who have the authority [over the employee].");  <u>Abramson</u>, 260 F.3d at 286 ("Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the [adverse employment decision]" (collecting cases in support)).  Nor does the fact that the statement was made years before the event in question bar its use to show inherent bias.  <u>Roebuck v. Drexel University</u>, 852 F.2d 733, (3d Cir.1988) (upholding admissibility of discriminatory comment by decisionmaker five years before adverse employment action).  And it is beyond question that evidence sufficiently reflecting harassing or discriminating bias is admissible to prove intent or motive, the existence of a hostile environment and pretext.  <u>Aman</u>, 85 F.3d at 1086.  Indeed, such evidence can at times be critical to the interpretation of ambiguous treatment or the general harassment of an employee.  <u>Hurley v. Atlantic City Police Dept.</u>, 174 F.3d 95, 111-12 (3d Cir.1999).

Here, the statements by plaintiff's immediate supervisors have a number of purposes that are separate from the question of whether those in upper management actually directed plaintiff's supervisors to undertake such initiatives. The very utterance of the statements are probative to the intent and bias of the declarant, their impact on the environment as it relates to the way it would be perceived by both plaintiff and a reasonable employee of plaintiff's age, and the general attitude of those who were placed in immediate charge of Foundation's workforce. Consequently, Foundation's blanket challenge to such evidence at summary judgment must be rejected.

For the reasons set forth above, Network's motion will be denied and Foundation's motion will be granted as to plaintiff's failure to promote/hire claim and denied in all other aspects. An appropriate order will follow.


Date: September 17, 2010


                                                  s/ David Stewart Cercone
                                                  David Stewart Cercone
                                                  United States District Judge


cc:     Neal A. Sanders, Esquire
        Dirk D. Beuth, Esquire
        Law Offices of Neal Sanders
        1924 North Main Street Ext.
        Butler, PA 16001

        John E. Quinn, Esquire
        Portnoy & Quinn, LLC
        36th Floor, One Oxford Centre
        Pittsburgh, PA 15219

Stephen J. Mirizio, Esquire
Stephen J. Mirizio Law Offices
121 E. State Street
Sharon, PA 16146

Deborah A. Kane, Esquire
Weber Gallagher Simpson Stapleton Fires & Newby
603 Stanwix Street
Two Gateway Center, Suite 1450
Pittsburgh, PA 15222